**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-7123**

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**Samiha Ayyash, et al Plaintiffs – Appellants Pro Se,**

**V.**

**American Airlines Inc., et al Defendants – Appellees.**

Appeal from the United States District Court for the District of Columbia, No. 1:24-cv-03434-ACR (Judge Ana C. Reyes )

# BRIEF OF APPELLANTS SAMIHA AYYASH, FERAS HINDI, TALA JOSEPHANO

Pro Se Plaintiff-Appellant
Feras Hindi
7823 New London Drive,
Springfield, VA 22153
(703)980-6955

Pro Se Plaintiff-Appellant
Tala Josephano
1876 PCH
Lomita CA 90717
(347)-749-4980

Pro Se Plaintiff-Appellant
Samiha Ayyash
No. 6 Abu Nssair
Amman Jordan
(703)623-3767

# 1. CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

## A. Parties and Amici

The following parties appeared in the district court and are parties to this appeal:

*Plaintiffs-Appellants:* Samiha Ayyash; Tala Josephano; Feras Hindi

*Defendants-Appellees:* American Airlines Inc. ; Gulf Air B.S.C

*Amici curiae :* NONE

## B. Rulings Under Review

Plaintiffs appeal the following rulings by U.S. District Judge Ana C. Reyes:

**Order of August 5, 2025 (Dkt. 69) (App. 24)** — granting Defendants' Motions to Dismiss (Dkts. 7, 42, 43) (App. 160, 385, 397); denying Plaintiffs' Motions (Dkts. 46, 47, 49, 54, 55, 56, 60) (App. 485, 493, 621, 650, 803, 828, 852); dismissing Plaintiffs' Complaints (Dkts. 1, 2) (App. 32); and directing the Clerk to close the case; **Minute Order of August 28, 2025** — denying Plaintiffs' Rule 60 Motion for Relief from Judgment (Dkt. 72) (App. 14); **Minute Order of March 28, 2025** — denying as moot Defendants' Motions (Dkts. 13, 14, 21, 30, 34, 35, 40, 41) and denying

Plaintiffs' Motions (Dkts. 17, 18, 19, 22, 26, 27) at the pre-motion conference.

**C. Related Cases:** This case has not previously been before this Court.

## 2. STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. The appeal presents factually intensive jurisdictional and procedural questions involving two defendants, twelve pleaded claims, and a dismissal with significant limitations consequences. Appellants proceed pro se, and oral argument would assist the Court in clarifying the record and focusing the inquiry on the determinative issues.

## 3. STATEMENT OF DISCLOSURE

Appellants are individual natural persons proceeding pro se. They are not corporations, nongovernmental corporate parties, partnerships, trade associations, or any other entity for which disclosure is required under Federal Rule of Appellate Procedure 26.1 or Circuit Rule 26.1. Accordingly, no parent corporation, publicly held corporation, or other entity exists that owns 10% or more of the stock of any Appellant, and there is no corporate disclosure information to report.

## TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES**

A. Parties and Amici …..2

B. Rulings Under Review…..2

C. Related Cases……3

**STATEMENT REGARDING ORAL ARGUMENT…..3**

**TABLE OF CONTENTS……4**

**TABLE OF AUTHORITIES….6**

**GLOSSARY OF ABBREVIATIONS AND DEFINITIONS…. 9**

**STATEMENT OF JURISDICTION………11**

A. District Court Subject-Matter Jurisdiction

1. Diversity Jurisdiction — 28 U.S.C. § 1332(a)(3)

2. Federal-Question Jurisdiction — 28 U.S.C. § 1331

B. Court of Appeals Jurisdiction

C. Timeliness of the Appeal

D. Finality

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW….12**

**STATEMENT OF THE CASE…….13**

A. Nature of the Case and Facts

B. Procedural History….18

**SUMMARY OF THE ARGUMENT…….28**

**ARGUMENT ….30**

1. The District Court Possessed Personal Jurisdiction Over GA and AA…….35

A. Codeshare Is a D.C.-Manufactured Product, Not a Logo

B. AA Designed the Modern Codeshare Framework in D.C. and Continues to Operate It from D.C.

C. Codeshare Is a D.C.-Manufactured Product, Not a Logo

D. AA Built the Modern Codeshare Framework from D.C. and Continues to Operate It from D.C.

E. The Codeshare Approval Process Is Centered in Washington, D.C.

F. AA and Gulf Air's Non-Compliance Manufactured the Factual Uncertainty That Prompted Dismissal

G. AA's Shielding of Gulf Air Is the Core of the Case, and It Originated in D.C.

2. The District Court Erred in Dismissing for Lack of Personal Jurisdiction Over AA & GA................. 40

A. Standard of Review

B. AA Does Not Petition D.C. from Afar — It Stationed Senior Officers in D.C. to Administer the Codeshare

C. AA Transacts Business and Contracts to Supply Services in the District Under D.C. Code § 13-423(a)(1) and (a)(2)

D. The Government-Contacts Doctrine Does Not Shield American Airlines

E. The District Court Resolved the Decisive Factual Question Against Appellants on a Disputed Record

F. Compounding the Error, the District Court Denied Jurisdictional Discovery

G. The District Court Erred in Dismissing Gulf Air for Lack of Personal Jurisdiction

H. The District Court Abused Its Discretion by Denying Jurisdictional Discovery

3. The Order Resolved a Disputed Causation Fact at Rule 12(b)(6)....... 45

A. The "Caused the Death" Framing Leaves Eleven of Twelve Claims Unanalyzed

B. Each Claim Is Plausibly Pleaded

4. Rule 8 ..................... 48

A. The Rule 8 Dismissal Was an Abuse of Discretion

B. The Alternative Rule 8 Ruling Exceeded the District Court's Authority

5. The District Court Abused Its Discretion by Dismissing Without Notice or Opportunity to Amend ...... 50

6. The Cumulative Procedural Unfairness Deprived Appellants of Due Process…50

**CONCLUSION**..... **52**

**CERTIFICATE OF COMPLIANCE** ............... **54**

**CERTIFICATE OF SERVICE** ........... **56**

# TABLE OF AUTHORITIES

## Cases


| CASE |
|---|
| *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987) |
| *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) |
| *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) |
| *Ciralsky v. CIA*, 355 F.3d 661 (D.C. Cir. 2004) |
| *Companhia Brasileira Carbureto De Calcio v. Applied Industrial Materials Corp.*, 35 A.3d 1127 (D.C. 2012) |
| *Crane v. New York Zoological Society*, 894 F.2d 454 (D.C. Cir. 1990) |
| *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) |
| *Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) |
| *Foman v. Davis*, 371 U.S. 178 (1962) |
| *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) |
| *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) |
| *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) |
| *Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023) |
| *Mathews v. Eldridge*, 424 U.S. 319 (1976) |
| *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) |
| *Rose v. Silver*, 394 A.2d 1368 (D.C. 1978) |
| *Salahuddin v. Cuomo*, 861 F.2d 40 (2d Cir. 1988) |
| *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006) |
| *Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 1995) |
| *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) |
| *Walden v. Fiore*, 571 U.S. 277 (2014) |

## STATUTES AND RULES

| AUTHORITY |
|---|
| U.S. Const. amend. I (Petition Clause) |
| U.S. Const. amend. V (Due Process) |
| 28 U.S.C. § 1291 |
| 28 U.S.C. § 1331 |
| 28 U.S.C. § 1332(a)(3) |
| 28 U.S.C. § 1605(a) |
| 28 U.S.C. § 1631 |
| 28 U.S.C. § 636(c) |
| D.C. Code § 13-423(a)(1) |
| D.C. Code § 13-423(a)(2) |
| Fed. R. Civ. P. 4(k)(2) |
| Fed. R. Civ. P. 5(b)(2)(C) |
| Fed. R. Civ. P. 6(b) |
| Fed. R. Civ. P. 8(a)(2) |
| Fed. R. Civ. P. 8(d)(2)–(3) |
| Fed. R. Civ. P. 11(a) |
| Fed. R. Civ. P. 12(b)(1) |
| Fed. R. Civ. P. 12(b)(2) |
| Fed. R. Civ. P. 12(b)(6) |
| Fed. R. Civ. P. 12(f) |
| Fed. R. Civ. P. 15(a)(1)(A) |
| Fed. R. Civ. P. 15(a)(2) |
| Fed. R. Civ. P. 60(d)(3) |
| Fed. R. App. P. 4(a)(4)(B)(i) |
| 14 C.F.R. Part 212 |
| 14 C.F.R. § 212.10 |

| AUTHORITY |
| --- |
| D.D.C. LCvR 83.9 |
| D.D.C. Standing Order § 9(a) (Reyes, J.) |

## OTHER AUTHORITIES

| AUTHORITY |
| --- |
| ICAO Annex 1 (Personnel Licensing — Pilot Medical Fitness) |
| ICAO Annex 6 (Operation of Aircraft) |
| ICAO Annex 7 (Aircraft Nationality and Registration Marks) |
| ICAO Annex 9 (Facilitation) |
| ICAO Annex 13 (Aircraft Accident and Incident Investigation) |
| ICAO Annex 19 (Safety Management) |
| Montreal Convention (Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999) |
| U.S.–Bahrain Open Skies Agreement |
| DOT Order DOT-OST-2022-0141 |
| DOT Docket OST-2008-0195 (Joint Application of American Airlines & Gulf Air) |
| Federal Code-share Safety Program (FAA AFS-50) |
| GSA City Pair Program |
| U.S. Dist. Ct. for the District of Columbia, Pro Se Handbook |

# GLOSSARY OF ABBREVIATIONS AND DEFINITIONS

| | |
|---|---|
| **Parties** | |
| **AA** | American Airlines, Inc. |
| **GA** | Gulf Air B.S.C. (Bahraini Shareholding Company) |
| **Government and Regulatory Bodies** | |
| **DOT** | United States Department of Transportation |
| **FAA** | Federal Aviation Administration |
| **AFS-50** | FAA Flight Standards Service, International Program Division (the FAA office in Washington, D.C. responsible for oversight of foreign air carriers, the International Aviation Safety Assessment ("IASA") program, and the International Code-share Safety Audit Program) |
| **ICAO** | International Civil Aviation Organization |
| **A4A** | Airlines for America (formerly the Air Transport Association ("ATA")), the Washington, D.C.-based principal trade and lobbying association of major U.S. airlines, of which American Airlines is the main member |
| **Aviation Safety Frameworks** | |
| **SMS** | Safety Management System (the systematic, organization-wide framework for managing safety risk required of operators under ICAO Annex 1, 19, comprising four pillars: Safety Policy, Safety Risk Management, Safety Assurance, and Safety Promotion) |
| **FRM** | Fatigue Risk Management (a data-driven approach for monitoring and mitigating crew-fatigue-related safety risks, implemented as a subsystem within an operator's SMS, addressed in ICAO Annex 6 and Annex 19; the formal program implementation is referred to as a Fatigue Risk Management System ("FRMS")) |
| **IASA** | International Aviation Safety Assessment Program (the FAA program that assesses whether a foreign country's civil aviation authority meets ICAO safety-oversight standards and assigns Category 1 or Category 2 status) |
| **JFK** | John F. Kennedy International Airport (New York, New York) |
| **IAD** | Washington Dulles International Airport (Dulles, Virginia) |
| **Medical** | |
| **PCI** | Percutaneous Coronary Intervention |

| | |
|---|---|
| **Procedural and Legal** | |
| **FRCP** | Federal Rules of Civil Procedure |
| **FRAP** | Federal Rules of Appellate Procedure |
| **LCvR** | Local Civil Rule of the United States District Court for the District of Columbia |
| **IIED** | Intentional Infliction of Emotional Distress |
| **NIED** | Negligent Infliction of Emotional Distress |
| **ECF** | Electronic Case Filing (the federal courts' electronic filing system, accessed through CM/ECF — Case Management/Electronic Case Files) |
| **Dkt.** | Docket entry in the underlying district-court action, No. 1:24-cv-03434-ACR |
| **Tr.** | Transcript of the March 28, 2025 pre-motion conference before Judge Reyes |
| **Substantive Definitions** | |
| **Incapacitation** | In aviation safety, the partial or complete inability of a flight crew member to perform assigned duties due to a sudden medical event (such as cardiac, neurological, or gastrointestinal illness) occurring during a duty period; on-duty crew incapacitations are reportable events under ICAO standards and applicable national civil-aviation regulations |
| **ICAO Annexes Referenced** | |
| **ICAO Annex 1** | Personnel Licensing — establishes international standards for the licensing of flight crew, including pilot medical-fitness requirements and enhanced medical screening for pilots over age 60 |
| **ICAO Annex 6** | Operation of Aircraft — establishes international standards governing the operation of aircraft in international commercial air transport, including requirements for flight and duty time limitations, fatigue management, and operator safety management |
| **ICAO Annex 7** | Aircraft Nationality and Registration Marks — establishes international standards for aircraft registration markings and nationality identification |
| **ICAO Annex 9** | Facilitation — establishes international standards governing the facilitation of international air transport, including border-crossing, passenger and crew documentation, and related procedures |
| **ICAO Annex 13** | Aircraft Accident and Incident Investigation — establishes international standards for the investigation and reporting of aircraft accidents and serious incidents, including reporting obligations and investigative procedures |

## 4. STATEMENT OF JURISDICTION

**A. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332(a)(3).**

**1. Diversity Jurisdiction — 28 U.S.C. § 1332(a)(3) :** The district court had jurisdiction under 28 U.S.C. § 1332(a)(3). Plaintiffs are citizens of Virginia (Alhindi), California (Josephano), and Virginia (Ayyash, a lawful permanent resident domiciled in Virginia). Defendant American Airlines is a citizen of Delaware and Texas, and Defendant Gulf Air is a citizen of Bahrain. No plaintiff shares citizenship with any defendant; complete diversity exists. Each plaintiff seeks more than $75,000, exclusive of interest and costs.

**2. Federal-Question Jurisdiction — 28 U.S.C. § 1331 :** The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims against AA and GA Air necessarily raise substantial and disputed issues of federal law, including federal aviation statutes, rules, regulations, and governing international aviation agreements, which also supply the standards of care for some of Plaintiffs' claims.

**B. Court of Appeals Jurisdiction :** This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment was entered on August 5, 2025. (Dkt. 69) (App. 24)

**C. Timeliness of the Appeal :** Final judgment was entered on August 5, 2025. Plaintiffs filed a Rule 60 motion and notice of appeal on August 24, 2025. The motion was denied on August 28, 2025, and the notice of appeal then became effective. Fed. R. App. P. 4(a)(4)(B)(i). (Dkt. 71) (App. 21); (Dkt. 72) (App. 14)

**D. Finality**
The district court entered a final judgment on August 5, 2025, dismissing all claims. (Dkt. 69) (App. 24). The Court may also review prior interlocutory orders

All three Appellants have standing to assert each claim brought against each Defendant. each Plaintiff suffered concrete, particularized injuries and damages fairly traceable to Defendants' conduct and redressable

## 5. A STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court committed legal error, reviewed *de novo*, in dismissing for lack of personal jurisdiction without resolving the disputed jurisdictional facts in Appellants' favor on the *prima facie* record, and abused its discretion in denying jurisdictional discovery on facts within Defendants' exclusive control. (Dkts. 54, 55) (App. 650, 803)

2. Whether the District Court committed legal error, reviewed *de novo*, and violated due process by dismissing under FRCP 8(a)(2) without notice, briefing, or hearing, after finding it lacked personal jurisdiction and after expressly deferring Rule 12(b)(6) briefing at the March 28, 2025 pre-motion conference. (App. 953)

3. Whether the District Court abused its discretion in dismissing the Amended Complaint without granting leave to amend or making any finding of futility, contrary to FRCP 15(a)(2) and the liberal-construction standard for pro se pleadings. (App. 32)

4. Whether the District Court committed legal error, reviewed *de novo*, and violated due process by adjudicating grounds drawn from American Airlines' withdrawn Rule 12(b)(6) motion (Dkt. 7) (App. 160) — grounds Gulf Air never raised — without notice or briefing.

5. Whether the District Court committed legal error, reviewed *de novo*, under Rule 12(b)(6) by adopting Defendants' factual assertions, declining to credit Appellants' well-pleaded allegations, and dismissing without claim-by-claim analysis of fraudulent misrepresentation, fraudulent concealment, constructive fraud, breach of fiduciary duty, intentional infliction of emotional distress, wrongful death and claims aroused after death. (Dkt. 2) (App. 32); (Dkt. 69) (App. 24)

6. Whether the cumulative procedural irregularities below — including reliance on a jurisdictional declaration while Appellants' motion to strike it remained pending (Dkt. 47) (App. 493), denial of jurisdictional discovery (Dkts. 54, 55) (App. 650, 803), adjudication of withdrawn and unraised grounds without notice, denial of Appellants' request to consent to a magistrate judge, and a consistent pattern of procedural rulings favoring Defendants — violated Appellants' Fifth Amendment due process rights, a question reviewed *de novo*.

## 6. STATEMENT OF THE CASE

### 6A. NATURE OF THE CASE AND FACTS

Pro Se family members of a deceased airline captain sought accountability, followed every procedural rule the District Court set, and had their case dismissed. The Amended

Complaint pleads twelve causes of action — negligence before death, negligence after death, negligence per se, wrongful death, breach of duties including fiduciary and superior-knowledge duties, fraudulent concealment before and after the Captain's death, fraudulent misrepresentation, omission, false representation, constructive fraud, IIED, and NIED and ongoing harm and damages — each separately captioned, identifying its plaintiff(s) and defendant and pleading its own elements. (App. 32)

This case concerns two airlines — Gulf Air B.S.C. ("GA") and American Airlines, Inc. ("AA") — that Appellants allege have, since their **2000 codeshare partnership**, violated federal aviation-safety regulations and DOT orders, defrauded crewmembers, their families, U.S. regulators, and the traveling public through false safety certifications, and caused Appellants distinct personal injuries. Under the federal Code-share Safety Program, AA must audit GA's compliance with DOT and FAA orders and ICAO standards — including pilot medical fitness, enhanced cardiovascular screening for pilots over 60, and on-duty crew-incapacitation reporting — and certify the results to the FAA in Washington, D.C. as a condition of each codeshare renewal. Since before 2008, AA has certified GA as fully compliant. Dkt. 2 ¶¶ 20(A), 26, 32, 36, 43–44, 524–528 (App. 32); Dkt. 54-1 at 22, 33. (App. 650)

GA had not operated non-stop flights to the United States since its U.S. operations were suspended in 1997. Dkt. 2 18(C) (App. 32). Since then, GA has sought to regain non-stop U.S. authority through successive DOT applications and certifications from 2017 through 2024 and a 2023 recruitment campaign targeting the U.S. public. Dkt. 2 ¶¶ 477, 480–481. (App. 32). GA filed its DOT codeshare-renewal and foreign-air-carrier-

permit application on December 6, 2022. A GA flight attendant, Yaser, had died on duty on a codeshare flight with American Airlines thirteen days earlier. Captain Alhindi died on duty eight days later. GA disclosed neither death in its DOT application — disclosure mandated by regulation as a sequenced crew incapacitation. Four months later, AA certified GA's full compliance to the FAA. Dkt. 2 ¶¶ 19(C), 21(A), (C)–(D), 441–442, 530, 532, 539. (App. 32). The FAA declined to investigate GA based on AA's confirmation of compliance.

**Before the Death:** Captain Mohannad Alhindi was a 63-year-old GA pilot of twenty-five years with a documented history of hypertension and a prior on-duty incapacitation in 2004 — a profile ICAO Annex 1 identifies as requiring enhanced cardiovascular screening. Dkt. 2 ¶¶ 19(A), 24–26, 36, 43 (App. 32); Dkt. 55 at 13 (App. 803). Appellants allege that GA failed to conduct the required screening in violation of DOT Orders and ICAO standards, and that AA's audits never identified or reported those failures. Dkt. 2 ¶¶ 4, 24–26, 43–44, 76, 524–528 (App. 32).

**The Incapacitation:** On December 14, 2022, while on duty and in GA uniform, Captain Alhindi became physically incapacitated at Dhaka Airport approximately five minutes before operating a GA–AA codeshare flight to JFK with onward U.S. service. Dkt. 2 ¶¶ 19(D), 21(B), 145 (App. 32); Dkt. 55 at 6 (App. 803). His death certificate identifies the cause of death as a 99% blockage of the left coronary artery — a progressive condition that develops over years and that the required screenings are designed to detect. Dkt. 2 ¶¶ 4, 429 (App. 32).

**During the Emergency:** Per Dhaka police investigation records, GA staff did not

perform an emergency medical response, directed the ambulance to a hospital with which GA had no pre-arranged care relationship, did not provide treating physicians with the Captain's medical history, and did not notify his family. Dkt. 2 ¶¶ 145, 168, 247–251, 253 (App. 32). For approximately eight hours no senior cardiologist was present. The Captain died while still in GA's operational custody. Dkt. 2 ¶¶ 4, 149, 247–251 (App. 32) . GA also misled Appellant Feras Hindi — the Captain's brother — about the Captain's condition and the hospital's capabilities to obtain his consent for a PCI procedure. Dkt. 2 ¶¶ 172, 247–267, 273–284(App. 32).

**After the Death:** GA took custody of the Captain's hospital records and delivered only a misrepresented death summary signed by a doctor not on staff, while withholding the underlying records. Dkt. 2 ¶¶ 291–295, 443–444 (App. 32). GA issued public statements in January 2023 misrepresenting the circumstances of the death (Dkt. 2 ¶¶ 471–473) (App. 32), interfered with Appellant Samiha Ayyash's inheritance rights (Dkt. 2 ¶¶ 683–688), and harassed Appellant Tala Josephano in a manner that "endangered [her] life by creating a hostile and unsafe environment" (Dkt. 2 686) (App. 32)— harassment that continued throughout the district court proceedings. Appellants allege this conduct was designed to silence them during the pendency of GA's DOT application. Dkt. 2 ¶¶ 21(C)–(D), 357, 441–442 (App. 32).

**The Certification:** In April 2023, AA submitted a new audit certification to the FAA affirming that GA "Meets the Criteria" for ICAO pilot-medical-fitness and incapacitation-reporting standards, and DOT renewed the codeshare on that basis. Tala had notified AA multiple times — in writing and at a press conference — of the

unreported deaths and GA's non-compliance before the certification. AA did not investigate, defer, or amend. Dkt. 2 ¶¶ 489–490, 509–511, 529–530, 532, 534–535, 539 (App. 32).

**Damages and Injuries.** Each Appellant alleges a distinct, individual injury independent of the Captain's death. Samiha alleges emotional trauma, physical health decline, interference with her inheritance rights, loss of financial support, and obstruction of her access to justice. Dkt. 2 ¶¶ 683–688 (App. 32). Feras alleges severe emotional distress arising from GA's misrepresentations to him during the medical emergency to obtain his consent for a PCI procedure under false pretenses, and financial strain from his investigative and legal efforts. Dkt. 2 ¶¶ 689–693 (App. 32). Tala alleges direct injury and financial loss from harassment that endangered her safety, obstruction of her efforts to retain counsel, and substantial costs from pursuing accountability. Dkt. 2 ¶¶ 354–357, 505, 548, 686 (App. 32).

**The Dismissal.** On August 5, 2025, the District Court dismissed the Amended Complaint for lack of personal jurisdiction under Rule 12(b)(2) and, in the alternative, *sua sponte* under Rule 8(a)(2). The Court ruled without a hearing, without ruling on Appellants' pending motions to strike the jurisdictional declaration (Dkt. 47) (App. 493) and for jurisdictional discovery (Dkts. 54, 55) (App. 650, 803), and without analyzing each separately pleaded cause of action. Dkt. 69 at 2, 4–8 (App. 24). On personal jurisdiction, the Court credited Defendants' declaration and resolved contested jurisdictional facts in Defendants' favor rather than Appellants'. Dkt. 69 at 4–7 (App. 24). The Rule 8 dismissal was entered *sua sponte*, without notice, briefing, or any opportunity

for Appellants — who are pro se — to amend; it relied in substance on the failure-to-state-a-claim grounds in American Airlines' withdrawn Rule 12(b)(6) motion (Dkt. 7; Tr. 9:2–6) (App. 160; App. 953) — grounds Gulf Air never raised. Dkt. 69 at 7–8 (App. 24). Appellants timely appealed. Dkt. 71 (App. 21).

## 6B. PROCEDURAL HISTORY

1.Appellants Samiha and Feras filed the original Complaint on December 10, 2024. Dkt. 1. Twenty-one days later, before either Defendant was served, Appellants filed the Amended Complaint as a matter of course under FRCP 15(a)(1)(A), joining Tala. Dkt. 2 (App. 32). Service was effected at each Defendant's D.C. registered agent: AA on January 22, 2025 (Dkt. 4) (App. 156), GA on January 30 (Dkt. 5) (App. 157). Responses were due February 12 and February 20, respectively.

2. On February 12, AA filed its initial motion to dismiss under Rules 12(b)(2) and 12(b)(6). Dkt. 7 (App. 160). The certificate of service certified Rule 5 compliance on Ayyash and Hindi, who had not consented to ECF notice; AA later acknowledged first-class mail was not sent until February 13 — one day late. Dkt. 20 ¶¶ 5–6 (App. 239); Tr. 8:13–15 (App. 953). The defective certificate remains uncorrected.

3. On February 20, 2025 — eight days after the answer deadline — AA filed Dkt. 14 (App. 189), conceding counsel had been "previously unaware of the Court's Standing Order" and seeking either to proceed on the prior motion or withdraw and refile after the pre-motion conference. Dkt. 14 at 1. Dkt. 14 was not styled as a Rule 6(b) motion for extension, did not assert excusable neglect, and did not address the Standing Order's requirement that extensions be sought by motion.

4. Appellants moved for entry of default based on the late service, the defective certificate, and AA's refusal to correct the record. Dkts. 16, 17, 19 (App. 193, 202, 223). AA opposed, conceding that counsel had only "believed" ECF would notify Appellants (Dkt. 20) (App. 239), that mail service was effected one day late (Dkt. 20) (App. 239), and that service was made "by first class mail as permitted by Rule 5(b)(2)(C)" (Dkt. 20) (App. 239). At the March 28, 2025 pre-motion conference, the District Court denied the default motions, ruling that defendants need not serve filed motions on opposing parties — "they're not required to send you anything at all. All they're required to do is file their papers on the public docket, which they have done" (Tr. 6:13–15) — and excusing the late service as discretionary: "If they did not file on time, I don't really care, I'm giving them the extra time." Tr. 8:16–19. AA neither filed a Rule 6(b) motion nor made any showing of excusable neglect.

5. AA then withdrew Dkt. 7 on the record. Tr. 9:2–6 (App. 953). The court accepted the withdrawal but never docketed it. Dkt. 7 (App. 160) remained open until the August 5, 2025 Order purported to grant it.

6. Before the March 28, 2025 pre-motion conference, Appellants moved to strike AA's filings as defective. Dkts. 40 (Ayyash, targeting Dkts. 6, 7, 8); 41 (Hindi, targeting Dkts. 6, 7, 8, 14, 20). The court denied both as moot at the conference (Minute Order, Mar. 28, 2025), without addressing the certificate-of-service, late-service, or Dkt. 14 defects. The court instead ruled that Defendants had "appeared appropriately under my local rules" (Tr. 2:20–21) and "done everything procedurally correctly" (Tr. 7:20–21). When Josephano identified that AA "did admit that he served on the 13th, which is day after the deadline" (Tr. 8:13–15), the court did not address the admission. The certificate remains uncorrected.

7. GA's first appearance suffered from parallel defects. Served on January 30, 2025 with a February 20 response deadline (Dkt. 5), GA filed five documents on the deadline day through Darcy Osta and Mark Johnston of Eckert Seamans Cherin & Mellott — notices of appearance, a corporate-disclosure certificate, and a pre-motion conference request. Dkts. 9–13. The pre-motion request was untimely under the Standing Order, which required filing before the answer deadline. On February 20 and 21, the Clerk issued two notices that both attorneys' D.C. District Court memberships had lapsed, that they were "not in good standing," and "not permitted to file" under Local Civil Rule 83.9, with a curative deadline of February 27. GA filed no Rule 6(b) motion for extension, never re-filed or re-served its notices after curing, and never served Appellants with the corrected filings.

8. Appellants also moved to strike GA's February 20 filings (Dkts. 9, 10, 12, 13) and its March 10 opposition (Dkt. 25) under the court's inherent authority and Rule 12(f), on grounds that the filings violated Rule 11(a) (attorneys not in good standing), Local Civil Rule 83.9 (D.C. Bar membership), and Standing Order § 9(a) (extensions require motion). Dkts. 34 (Hindi); 35 (Ayyash). The court denied both as moot at the March 28 conference (Minute Order, Mar. 28, 2025), without addressing the bar-status defect, the untimely pre-motion request, or the failure to re-serve. Applying its blanket compliance ruling — that Defendants "were allowed to file everything they filed and they raised personal jurisdiction at the right time" (Tr. 5:11–13) — the court did not require GA to correct the record, re-file, or re-serve. GA's defective filings remain uncorrected.

9. On the date AA filed Dkt. 7, Josephano received no notice through any of the three service methods AA's certificate represented. CM/ECF did not transmit the notice, though her

pro se ECF consent (Dkt. 3) remained active on the docket and no deactivation had been initiated by her or any Appellant. The email listed on the certificate was misspelled and was not Josephano's actual address. Mail service was not effected until February 13 — one day late. Dkt. 20 ¶¶ 5–6. Ayyash and Hindi had never consented to ECF or email service, AA also missed.

10. On March 7, 2025, Josephano affirmatively deactivated her ECF consent. Dkt. 24. At the March 28 conference, the court did not address the February 12 non-delivery or require correction of the certificate, and instead attributed the deactivation collectively to all three Appellants: "for some reason that I do not understand, you all sent an email to my courtroom deputy saying that you no longer wanted to receive emails." Tr. 9:7–9. That characterization conflated Josephano's later March 7 deactivation with the unrequested February 12 non-delivery and ascribed to Ayyash and Hindi an ECF preference they had never had.

11. In March 2025, Appellants placed on the record grievances against the assigned intake case manager. Hindi and Ayyash filed Notices of Intent on March 15 (Dkts. 28, 29); on March 18, Appellants jointly filed an Emergency Motion for Hearing and Order to Remove Case Manager (Dkt. 30) and Notice of Intent to Sue (Dkt. 31). The Emergency Motion identified three categories of conduct disadvantaging Appellants: (i) failure to provide the consent form for proceeding before a magistrate judge under 28 U.S.C. § 636(c), despite repeated written and undocketed telephone requests; (ii) disparate handling of pro se filings — delays of up to eleven days for Appellants' submissions while Defendants' counsel-filed submissions were entered same-day, the unrequested deactivation of Josephano's ECF notifications, and an eleven-day delay docketing the return of service on GA (Dkt. 5, served

January 30, entered February 10) that spanned the January 31 service of DOT Order DOT-OST-2022-0141; and (iii) disclosure to Defendants' counsel of Appellants' communications with the case manager— documented by GA's March 26 filing opposing Appellants' March 15 Notices (Dkt. 39) and GA's March 10 default opposition referencing communications that could only have come from the case manager (Dkt. 25).

12. At the March 28 conference, the court denied Dkts. 30 and 31 as moot without addressing any of the three categories. Minute Order, Mar. 28, 2025. Appellants were never offered the option to consent to a magistrate judge under § 636(c), and no consent form was ever issued.

13. On March 26, 2025, the court entered a minute order directing that no party file further motions without leave of Court and stating that all pending motions would be addressed at the pre-motion conference. Minute Order, Mar. 26, 2025.

14. Appellant Samiha Ayyash, who is not a native English speaker and required interpretation to participate meaningfully, did not attend the March 28, 2025 pre-motion conference. The transcript nonetheless lists her as appearing (Tr. cover page), and the court addressed Plaintiffs collectively throughout the conference, including in its rulings denying Samiha's individually filed motions for entry of default (Dkt. 19), to strike (Dkt. 35), and to strike AA's filings (Dkt. 40). Tr. 2:20–21, 5:11–13, 7:20–21; Minute Order, Mar. 28, 2025. The court did not inquire on the record whether Samiha was present or whether interpretation had been arranged, did not separately address her individually filed motions, and ruled on those motions in her absence.

15. On April 17, 2025, AA filed its operative motion seeking dismissal under Rule

12(b)(2) only. Dkt. 42 (App. 385). The next day, GA filed its operative motion seeking dismissal under Rules 12(b)(1), 12(b)(2), and 12(b)(5). Dkt. 43 (App. 397). Neither motion raised Rule 8 or Rule 12(b)(6). The August 5, 2025 Order acknowledges this and attributes the Rule 8 ground solely to AA's earlier Dkt. 7 (Dkt. 69 at 3) (App. 24) — the motion withdrawn on the record at the March 28 conference.

16. On May 9, 2025, Appellants filed a Notice in Support of Motion to Recuse based on the court's conduct at the March 28 conference, again renewing the § 636(c) request. Dkt. 44. The court did not rule. On May 19, the court granted Appellants' motion for extension of time (Dkt. 45), setting Appellants' opposition deadline at June 12 and Defendants' reply at July 3. Minute Order, May 19, 2025.

17. On May 27, Josephano filed a Motion for Protective Order and Hearing (Dkt. 46) detailing the dates and circumstances of harassment and interference she had experienced in connection with this litigation and her reports to law enforcement. Two days later, Appellants moved to strike GA's declarations accompanying its motion to dismiss as inadmissible, with supporting evidence. Dkt. 47. On June 4, Appellants filed an Emergency Motion to Stay (Dkt. 49), asking the court to halt briefing until it addressed the harassment, the recusal filing, and the case-manager grievances. The court did not rule on any of these motions.

18. At the March 28 conference, the court had warned Josephano that "if I find that Mr. Ticatch is getting harassed by you, I have all the power in the world to impose" consequences (Tr. 15:16–19) and instructed the parties generally that "if any party here is abusing the system, or harassing the other side, please bring it to my attention and we will get it dealt with" (Tr. 17:4–6). Appellants brought Josephano's harassment to the court's attention through Dkts.

46 and 49. The court did not rule on either.

19. With Dkt. 49 unresolved and the June 12, 2025 opposition deadline approaching, Appellants acted to preserve their threshold objections before it expired. On June 12 — the deadline — Appellants filed Motions for Leave to Conduct Jurisdictional Discovery as to each Defendant (Dkts. 54, 55), each accompanied by a memorandum and exhibit identifying the specific disputed jurisdictional facts.

20. On June 13 and June 20, Josephano filed corrective leave motions (Dkts. 56, 60) after Appellants recognized the March 26 minute order's pre-filing restriction had never been clarified or lifted — notwithstanding that the court had accepted Defendants' April 17 and 18 operative motions (Dkts. 42, 43) without requiring leave. The Clerk docketed Dkts. 47, 49, 54, and 55 as substantive motions, and Defendants opposed each on the merits. Dkts. 52, 53, 57, 62, 63, 65.

21. Appellants did not file a substantive merits opposition within the briefing schedule. The Motion to Strike (Dkt. 47) sought to remove from the record the very declaration and exhibits Defendants relied on; the Discovery Motions (Dkts. 54, 55) sought the factual development necessary to oppose on a complete record. Both were threshold remedies the court had not acted on. The Emergency Motion to Stay (Dkt. 49) sought to halt briefing pending those rulings; again, the court did not rule. Appellants accordingly filed the Motion to Strike, the Discovery Motions, and, on July 7, a supporting memorandum (Dkt. 67) that expressly stated it was not a merits opposition.

22. On August 5, 2025, the court issued its Memorandum Opinion and Order dismissing the action without prejudice and directing the Clerk to close the case. Dkt. 69 (App. 24). The

Order was entered without a hearing; none was held in the four-plus months between the March 28 pre-motion conference and dismissal. The Order purports to "GRANT[ ] Defendants' Motions to Dismiss, Dkts. 7, 42, 43" (Dkt. 69 at 8) (App. 24) — including AA's withdrawn Dkt. 7, without acknowledging the withdrawal — and denies Appellants' Dkts. 46, 47, 49, 54, 55, 56, and 60 in a single sentence (Dkt. 69 at 8) (App. 24) without individual analysis. The Order does not address Appellants' Notice in Support of Motion to Recuse (Dkt. 44), filed against the same judge who issued the dismissal, or Appellants' renewed § 636(c) request. The case was terminated on the docket the following day. Docket, Date Terminated: 08/06/2025.

23. On August 24, 2025, Appellants timely filed their Notice of Appeal. Dkt. 71 (App. 21). The appeal was docketed as No. 25-7123 on August 27. The same day as the Notice of Appeal, Appellants filed a Motion for Relief from Judgment under Federal Rule of Civil Procedure 60(d)(3) (Dkt. 72) (App. 14), asserting fraud on the court and seeking vacatur of the August 5 dismissal, restoration of filings improperly docketed or omitted from the record, referral to the appropriate judicial-oversight authority, and assignment of an independent judge to decide the motion.

On August 27, 2025, this Court entered an order holding the appeal in abeyance pending resolution of the Rule 60 motion. Dkt. 74. The next day, notwithstanding Appellants' request for an independent judge, the dismissing judge — whose conduct the Rule 60(d)(3) motion placed at issue — denied the motion by minute order, concluding that it identified "only occasions when the Court itself has taken certain actions in disposing of this case" and did not make out a basis for Rule 60(d)(3) relief. Minute Order, Aug. 28, 2025; Dkt. 75.

Separately, Appellants submitted a post-dismissal Notice of Intent to Sue, which the Clerk flagged as requiring leave because the case was closed. Dkt. 70.

## 7. SUMMARY OF THE ARGUMENT

The District Court erred in holding it lacked personal jurisdiction over Gulf Air and American Airlines. Appellants made a *prima facie* showing under D.C.'s long-arm statute, D.C. Code § 13-423(a)(1), and under Federal Rule of Civil Procedure 4(k)(2) on their federal-law claims — including AA's regulatory submissions to FAA AFS-50 in the District, AA's continuous D.C. corporate registration since 1955, and GA's codeshare ticket sales to D.C. residents and DOT and FAA filings in the District. The court did not address Rule 4(k)(2) at all, credited Defendants' single declaration over Appellants' allegations, and resolved disputed jurisdictional facts against Appellants — contrary to the *prima facie* standard. (Dkts. 54, 54-1, 55) (App. 650, 803)

The court abused its discretion in denying Appellants' narrowly tailored Motions for Leave to Conduct Jurisdictional Discovery (Dkts. 54, 55) (App. 650, 803), which sought facts within Defendants' exclusive control. Denial of jurisdictional discovery on a contested record where the plaintiff has identified specific categories of forum-directed conduct is reversible. The alternative Rule 12(b)(6) ground was procedurally infirm and substantively unsound. It rested on AA's withdrawn Dkt. 7 (App. 160) — a motion the court itself had directed the parties to defer — and was decided without notice, briefing, or hearing. Substantively, the Order analyzed only a single causation theory tied to Captain Alhindi's medical event and ignored the eleven other separately pleaded claims,

including fraud, fraudulent concealment, and constructive fraud against AA arising from its certifications submitted in the District. (Dkt. 2) (App. 32); (Dkt. 69) (App. 24)

The Rule 8(a)(2) ground was entered *sua sponte*, without notice, briefing, or hearing, after the court had found it lacked personal jurisdiction. *Sua sponte* dismissal under Rule 8 without notice and an opportunity to respond is reversible. The court denied leave to amend without finding futility, contrary to Federal Rule of Civil Procedure 15(a)(2) and the liberal-construction standard for pro se pleadings.

The cumulative procedural irregularities — reliance on a jurisdictional declaration while Appellants' motion to strike (Dkt. 47) remained pending, denial of jurisdictional discovery, adjudication of withdrawn and unraised grounds without notice, denial of Appellants' request to consent to a magistrate judge, and a consistent pattern of procedural rulings favoring Defendants — together violated Appellants' Fifth Amendment due process rights. Appellants proceeded pro se, complied with the District Court's Pro Se Handbook, and filed using the Court's official federal complaint forms. They responded in good faith to all jurisdictional screening questions based on the information available at filing. Material jurisdictional facts — internal audit procedures, AA's correspondence with federal agencies, codeshare compliance details — were and remain in Defendants' or third parties' exclusive control.

The dismissal should be vacated and the case remanded with instructions to permit jurisdictional discovery.

## 8. ARGUMENTS

### 1. The District Court Possessed Personal Jurisdiction over GA and AA

### A1. Codeshare Is a D.C.-Manufactured Product, Not a Logo.

AA's codeshare program is a product manufactured in the District. It is designed, negotiated, established, contracted, audited, marketed, and sold through AA's D.C. offices and D.C.-headquartered federal regulators. Dkts. 54-1, 55 (App. 650, 803). The District Court, adopting AA's withdrawn Dkt. 7 (App. 160) characterization, treated codeshare as a shared airline logo. Order at 3 (App. 24). The record shows otherwise: AA negotiates and signs codeshare agreements with foreign carriers in the District, performs the recurring safety audits required to sustain those agreements, submits the resulting certifications to FAA and DOT in the District, and markets and sells codeshare tickets to D.C. residents through its D.C. offices and websites. These are independent commercial contacts — not petitioning activity — that create "continuing obligations" with forum residents and constitute purposeful availment. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). They directly relate to Appellants' claims, which arise from those D.C.-based audits and certifications.

### B1. AA Designed the Modern Codeshare Framework in D.C. and Continues to Operate It from D.C.

AA was a principal architect of the modern international codeshare framework, advancing codesharing as a commercial model through sustained D.C. lobbying — including through the D.C.-based Air Transport Association (now A4A), of which AA is a key member. Dkts. 54-1, 55 (App. 650, 803) . AA's D.C. advocacy helped produce the legal structure that allows Category 2 carriers like Gulf Air to access the U.S. market through codeshare without

direct operating authority. AA has maintained physical offices in the District since the 1990s — not by regulatory mandate but voluntarily established to negotiate, audit, and oversee codeshare operations from the forum. Dkt. 54-1 at 32(App. 650). These are sustained, voluntary, forum-directed commercial contacts at the heart of Appellants' claims.

**C1. Codeshare Is a D.C.-Manufactured Product, Not a Logo.**

AA's codeshare program is a product manufactured in the District — designed, negotiated, audited, and sold through AA's D.C. offices and D.C.-based federal regulators. Dkts. 54-1 (App. 650). The District Court, adopting AA's withdrawn Dkt. 7 characterization, treated codeshare as the equivalent of a shared airline logo. Order at 3. The record shows otherwise: AA negotiates and signs codeshare agreements with foreign carriers in the District, performs the recurring safety audits required to sustain those agreements, submits the resulting certifications to FAA and DOT in the District, and markets and sells codeshare tickets to D.C. residents through its D.C. offices and websites. These are independent commercial contacts — not petitioning activity — that create "continuing obligations" with forum residents and constitute purposeful availment. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). They directly relate to Appellants' claims, which arise from those D.C.-based audits and certifications.

**D1. AA Built the Modern Codeshare Framework from D.C. and Continues to Operate It from D.C.**

AA was a principal architect of the modern international codeshare framework. Through sustained D.C. lobbying — including through the D.C.-based Air Transport Association (now A4A), of which AA is a key member — AA drove the legal structure

that permits Category 2 carriers like Gulf Air to access the U.S. market through codeshare without direct operating authority. Dkts. 54-1, 55. AA has maintained physical offices in the District since the 1990s, not by regulatory mandate but voluntarily established to negotiate, audit, and oversee codeshare operations from the forum. Dkt. 54-1 at 32. These are sustained, voluntary, forum-directed commercial contacts that satisfy both D.C. Code § 13-423(a)(1) and Fifth Amendment due process.

**E1. The Codeshare Approval Process Is Centered in Washington, D.C.**

Every step of codeshare approval is administered in the District. Under 14 C.F.R. Part 212, codeshare applications must be filed with the DOT at 400 7th Street, S.W., Washington, D.C. The U.S. carrier applicant must submit a Compliance Statement certifying that it has completed an audit of the foreign codeshare operator against ICAO safety standards and that the audit is available for FAA review. The audit itself is reviewed by the FAA's AFS-50 International Program Division in Washington, D.C. Dkt. 54-1 at 15, 22. The application, the agreement, the audit, the compliance certification, and the reviewing agencies are all in the forum. D.C. is therefore the operative jurisdiction for every codeshare AA conducts with a foreign carrier, including Gulf Air — and the conduct giving rise to Appellants' claims occurred here.

**F1. AA and Gulf Air's Non-Compliance Manufactured the Factual Uncertainty That Prompted Dismissal.**

The District Court deemed it "impossible to see how" Defendants' regulatory failures contributed to Captain Alhindi's incapacitation and dismissed the wrongful-death claim on that basis. Order at 7. That uncertainty stemmed directly from Defendants' own

violations. Under ICAO Annex 1 and AA's DOT-approved codeshare audit program, AA was required to perform recurring medical-fitness evaluations and crew-incapacitation reporting — protocols designed to detect precisely the progressive 99% coronary blockage that developed in the Captain over years and killed him. Dkt. 2 ¶¶ 4, 26(A), 429. AA and Gulf Air skipped those evaluations and concealed the non-compliance through false certifications to D.C.-based federal regulators. Dkt. 2 ¶¶ 489–490, 530, 532, 539.

The Captain's death was no outlier. It was the latest in Gulf Air's documented pattern of crew incapacitations — including the Captain's own 2004 episode and the November 2022 flight-attendant incident noted in the Order. Order at 2; Dkt. 2 ¶¶ 19(A), 19(C), 19(D).

These are precisely the risks AA's audits were designed to surface. The Order's declaration that "[s]afety issues from decades-old incidents have zero bearing on whether an airline pilot suffers a heart attack" (Order at 7) resolved a fact-intensive causation dispute against Appellants on a motion to dismiss — without aviation or medical evidence, and without drawing reasonable inferences in the non-movant's' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (plausibility requires drawing reasonable inferences in favor of the non-movant); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (plaintiff entitled to "the benefit of all inferences that can be derived from the facts alleged"). The error shielded Defendants' self-manufactured evidentiary gaps.

**G1. AA's "Shielding" of Gulf Air Is the core of the Case, and It Originated in D.C.** The foundational conduct giving rise to this case — AA's negotiation, execution,

and continued certification of its codeshare with Gulf Air — was directed and performed from AA's D.C. office and submitted to D.C.-based federal regulators through the filings identified above. AA's D.C. staff prepared the initial joint application in DOT Docket OST-2008-0195, the Statement of Authorization, every biennial renewal, and every safety audit certification that kept the codeshare alive. These are not ministerial filings. They are the substantive legal representations on which DOT authority to operate the codeshare depends, and they were made in AA's name, from the District.

AA cannot displace responsibility for those representations onto the carrier it was obligated to audit. AA's audit and certification obligations ran directly to the D.C.-based federal regulators that granted codeshare authority under 14 C.F.R. § 212.10 and the governing DOT audit framework; AA cannot discharge those obligations by pointing to Gulf Air. Gulf Air's deflection of responsibility for its own safety record — as in the 2000 crash, where it sought to shift blame to Airbus despite contrary black-box evidence — is precisely the pattern AA's audit obligations were designed to check. Instead, AA shielded Gulf Air: notified of Gulf Air's violations, AA certified compliance anyway and failed to report the pattern of crew incapacitations and training deficiencies in its certifications to the D.C.-based federal regulators — enabling Gulf Air to retain and expand its U.S. market access through the AA codeshare umbrella.

This course of conduct — AA's repeated misrepresentation to D.C. regulators to preserve a codeshare it was legally obligated to police — is not incidental to the claims. It is the claims. The negligence claim is AA's failure to audit and report. The fraud claim is

AA's false Compliance Statements. Both occurred through AA's D.C.-based regulatory conduct and continued after Captain Alhindi's death through renewed certifications. Because AA's shielding of Gulf Air was directed at and executed from the District of Columbia, the conduct satisfies D.C. Code § 13-423(a)(1) and (a)(2), and Plaintiffs' claims arise directly from it.

### 2. The District Court Erred in Dismissing for Lack of Personal Jurisdiction Over AA & GA

#### A2. Standard of Review.

This Court reviews the Rule 12(b)(2) dismissal de novo. On the papers without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts, and "any factual disputes must be resolved in the plaintiff's favor." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (cited by the District Court at Order 3). The District Court recited this standard but failed to apply it. The Order acknowledged that a pro se complaint must be read "together with all the plaintiff's filings" (Order at 1 n.1) yet did not credit the jurisdictional allegations and supporting exhibits Appellants submitted in their Amended Complaint, Motions for Leave to Conduct Jurisdictional Discovery (Dkts. 54, 54-1, 55), and July 7, 2025 memorandum (Dkt. 67) and GA Strike motions. Those filings, read together, established at minimum a prima facie showing sufficient to warrant discovery.

#### B2. AA Does Not Petition D.C. from Afar — It Stationed Senior Officers in D.C. to Administer the Codeshare.

For seventeen years, AA has administered its codeshare with Gulf Air through senior corporate officers based at its D.C. offices at 1101 and 1200 17th Street NW — including a

Senior Vice President and Associate General Counsel and a Vice President for Regulatory Affairs. AA's submissions establishing and renewing the codeshare from 2008 through 2025 — including the joint application in DOT Docket OST-2008-0195, the biennial renewals, and the FAA Compliance Statements submitted to AFS-50 — were signed for AA from those D.C. offices. That includes the renewal submitted in 2025, after Captain Alhindi's death and after this action was filed. Dkts. 54, 54-1 (Ex. 10), 67. AA conducts the codeshare's regulatory and contracting work in the forum, through its own forum-based senior officers. These are continuous, present-day commercial contacts — not occasional petitioning activity — sufficient to establish purposeful availment under *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985).

**C2. AA Transacts Business and Contracts to Supply Services in the District Under D.C. Code § 13-423(a)(1) and (a)(2).**

Appellants preserved both prongs of the long-arm statute. Dkt. 54-1 at 38–40.

***Transacting business under § 13-423(a)(1)***: AA's D.C. presence is continuous and substantial: 53% market share at Reagan National Airport, which AA markets as a Washington, D.C. hub; targeted marketing to D.C. consumers and federal travelers; and continuous D.C. corporate registration since 1955. Dkt. 54-1 at 17, 28, 32–33.

***Contracting to supply services under § 13-423(a)(2)***: AA supplies the codeshare under Agreement No. 98-104 (DOT Docket OST-2008-0195) and contracts directly with D.C.-headquartered federal agencies through the GSA City Pair program. Dkt. 54-1 at 23–25, 38–39.

***Relatedness***. Appellants' claims arise directly from AA's D.C. conduct: the false FAA

Compliance Statements submitted from AA's D.C. offices, the failed Gulf Air audits conducted under the D.C.-administered codeshare, and the 2025 renewal certification submitted from D.C. during this litigation. That satisfies the disjunctive "arise out of or relate to" standard of *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–62 (2021).

**D2. The Government-Contacts Doctrine Does Not Shield American Airlines.**

**1. American forfeited the government-contacts argument by raising it for the first time in reply.**

American did not invoke the government-contacts doctrine in either of its two motions to dismiss (Dkts. 7, 42-1). It surfaced the argument only in its reply brief (Dkt. 61 at 6–7), citing *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55, 62 (D.D.C. 2006) — the same authority the district court then adopted (Dkt. 69 at 6). Pro se Plaintiffs had no procedural vehicle to respond, and no opportunity to develop a factual record addressing the fraud exception that governs the doctrine's application. Under D.C. Code § 13-423(a)(1), which extends in personam jurisdiction to the limits of due process, the D.C. Court of Appeals has squarely held that the "amendment of the long-arm statute to provide for a 'transacting any business' standard . . . has shifted [the government-contacts principle's] premise solely to the First Amendment." *Rose v. Silver*, 394 A.2d 1368, 1374 (D.C. 1978). The doctrine is no longer a freestanding due-process bar; it is a Petition Clause shield.

That reading is not a dated artifact of *Rose*. The D.C. Court of Appeals' subsequent decision in *Companhia Brasileira Carbureto De Calcio v. Applied Industrial Materials*

*Corp.*, 35 A.3d 1127 (D.C. 2012), confirms it by operation: the court conditioned the doctrine's protection on the petitioner's good faith, recognizing a fraud exception. *Id.* at 1134. A pure due-process contacts analysis would be indifferent to the petitioner's good faith; only a Petition-Clause-grounded doctrine turns on it. The fraud exception is therefore the doctrinal tell that *Rose*'s First Amendment framing is the current rule. American invoked the doctrine as a categorical jurisdictional bar. The district court accepted that framing without any First Amendment analysis (Dkt. 69 at 6). That is precisely the "earlier, ambiguous incarnation" *Rose* rejected, and it cannot support dismissal.

The Petition Clause does not immunize fraudulent regulatory submissions, and the Amended Complaint pleads that fraud with particularity.

The controlling rule in this jurisdictional context is stated in *Companhia Brasileira*: "A person who uses the government as an instrumentality of fraud, and thereby causes unwarranted government action against another, forfeits the protection of the government contacts exception." 35 A.3d at 1134. The Amended Complaint pleads exactly such conduct, with date-specific particularity:

December 14, 2022: Captain Alhindi died from cardiac incapacitation in connection with a codeshare flight; Gulf Air had immediate actual knowledge. Compl. ¶21B; December 17–22, 2022: Gulf Air failed to report the death to DOT and submitted further D.C. filings that "suppress[ed] material facts."; April 19 and 22, 2023: Plaintiff Tala twice notified American's CEO and legal team, providing detailed evidence of Gulf Air's unreported crew incapacitations; Around April 28, 2023: American electronically

submitted to the FAA in Washington, D.C. certifications affirming that Gulf Air "Meets the Criteria" for ICAO Annexes 1, 6, 13, and 19 — six days after the second notification and four months after the death. Compl. ¶¶ 526, 530, 532.

These certifications were the regulatory mechanism by which Gulf Air retained U.S. market access, and the Amended Complaint alleges they "materially influenced the FAA's final approval on April 28, 2023." Compl. ¶536. Truthful disclosure would have prevented that approval — the "unwarranted government action" *Companhia Brasileira* contemplates. 35 A.3d at 1134. On a Rule 12(b)(2) motion, these allegations must be accepted as true. American has not challenged their sufficiency.

Even setting the fraud exception aside, specific jurisdiction is satisfied on the defendant's own forum conduct. The April 28, 2023 FAA certifications were submitted to a federal agency in the District of Columbia and are the very conduct giving rise to Plaintiffs' claims. That is forum-directed conduct by the defendant, not a unilateral plaintiff contact, and it bears a direct causal relationship to the injuries pleaded. *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014). Plaintiff Tala, an AAdvantage member, relied on those certifications when traveling on American's codeshare network. Compl. ¶¶ 542–544. The claim arises directly out of American's forum conduct, and specific jurisdiction lies. Each of these four grounds independently defeats the government-contacts defense. Together, they establish that the district court's dismissal of American Airlines for lack of personal jurisdiction cannot stand.

American's Own Forum Conduct Independently Satisfies Specific Jurisdiction. The April 28, 2023 Compliance Statements were submitted to the FAA in the District of

Columbia and are the conduct giving rise to Plaintiffs' claims — forum-directed conduct by the defendant, not a unilateral plaintiff contact. *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014). American sells codeshare tickets to D.C. consumers on the routes at issue and maintains a D.C. Regulatory Affairs Office as its point of submission for the Compliance Statements.

The claim arises directly out of American's forum conduct, and specific jurisdiction lies.

**E2. The District Court Resolved the Decisive Factual Question Against Appellants on a Disputed Record.**

Without an evidentiary hearing, Plaintiffs need only make a prima facie showing, and all factual disputes must be resolved in their favor. The District Court inverted the standard, accepting as established fact American's representation that the Compliance Statements were prepared "in Fort Worth, not in the District" (Order at 6) — though contested, unsupported by any declaration, and contradicted by American's own filings. Whatever drafting occurred in Fort Worth ( if it happened), the submission, signature, and regulatory action all occurred in the District. The "Fort Worth" representation was attorney argument, not evidence. American submitted no declaration identifying who prepared the Compliance Statements, where they were located, or what role its D.C. Regulatory Affairs Office played. Under *Mwani* and *Crane*, the plaintiff's prima facie showing controls absent contrary evidence, and an unsworn assertion in a brief is not evidence. The District Court was required to credit Appellants' contrary record evidence and resolve the factual dispute in their favor. *Crane*, 894 F.2d at 456. Its failure to do so is reversible error.

**F2. Compounding the Error, the District Court Denied Jurisdictional Discovery.**

Having resolved a contested factual question against Appellants without a hearing, the District Court then denied them the discovery needed to develop that record. Order at 7. That was an abuse of discretion. Jurisdictional discovery is justified where "a party demonstrates that it can supplement its jurisdictional allegations through discovery." *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). Appellants met that threshold: American's own contradictory filings, the FAA AFS-50 office's D.C. location, and the absence of any contrary declaration identified precisely the factual questions discovery would resolve regarding codeshare and contacts and including — who prepared the Compliance Statements, from which office, and under whose authority. Discovery would have permitted Appellants to prove jurisdiction on a developed record rather than on American's unsworn representation.

**G2. The District Court Erred in Dismissing Gulf Air for Lack of Personal Jurisdiction**

**i. The District Court did not address Federal Rule 4(k)(2).** Appellants raised Rule 4(k)(2) as an independent basis for jurisdiction on their federal-law claims. Dkt. 55 at 5, 9–10. The Rule reaches foreign defendants not "at home" in any state where due process is satisfied. Gulf Air conceded it is not at home in any U.S. state, yet its aggregated

nationwide contacts — New York and Los Angeles offices, DOT and FAA filings, and codeshare operations with American, Etihad, Delta, and United — satisfy due process. The Order does not mention Rule 4(k)(2); failure to address a properly raised jurisdictional basis is reversible error.

**II. The District Court ignored Gulf Air's D.C. commercial transactions and denied discovery.** Appellants made a prima facie showing under D.C. Code § 13-423(a)(1): codeshare ticket sales to D.C. residents through Gulf Air's website and major online distributors, a D.C.-registered agent, DOT and FAA filings in the District, and D.C.-centered codeshare operations. Dkt. 55 at 16. The court accepted Gulf Air's assertion of "no offices, assets, or employees" in the District (Order at 5) and dismissed without permitting the targeted discovery requested — codeshare revenue, D.C. ticket-sale data, and DOT submissions, all within Gulf Air's exclusive control. Dkt. 55 at 21–22. As for the internet sales, it was decided without facts. Denial of jurisdictional discovery on facts within the defendant's control is an abuse of discretion. *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996).

**III. The District Court misapplied the forum-interest factor.** The Order rejected jurisdiction over Gulf Air because Appellants reside in Virginia and California and "the events giving rise to the claims occurred abroad." Order at 5–6. That ignored the District-centered conduct Appellants pleaded: Gulf Air's DOT and FAA filings, its

concealment of Captain Alhindi's death and prior crew incapacitations from those filings, and its codeshare authority issued and renewed in the District. Dkt. 55 at 16, 19–20. The District has a substantial interest in adjudicating regulatory fraud directed at federal agencies it hosts. The Order's reliance on *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987), was misplaced: *Asahi* addressed foreign parties with no forum nexus and does not displace jurisdiction where, as here, the defendant's own forum conduct gives rise to the claim. *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014).

**IV. Gulf Air consented to jurisdiction through its DOT codeshare authority.** Every DOT order approving Gulf Air's foreign air carrier and codeshare operations, including Order 2023-4-16 in Docket DOT-OST-2022-0141 (issued Feb. 22, 2023; eff. Apr. 24, 2023), conditioned that authority on Gulf Air's express agreement that "operations under this authority constitute a waiver of sovereign immunity" under 28 U.S.C. § 1605(a) for claims "based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place," or claims "based on a claim under any international agreement or treaty cognizable in any court or other tribunal of the United States." Order 2023-4-16, App. Cond. (7); Dkt. 55 at 11. Captain Alhindi's flight fell squarely within both: the codeshare contract of carriage included U.S. points (JFK, IAD), and Plaintiffs' claims arise under the U.S.–Bahrain Open Skies Agreement and the Montreal Convention — treaties cognizable in U.S. courts. Dkt. 55 at 12. Gulf Air

cannot invoke U.S. codeshare privileges, accept DOT's jurisdictional conditions as the price of market access, and then disclaim the jurisdiction it consented to when sued.

**H2. The District Court Abused Its Discretion by Denying Jurisdictional Discovery.**

The threshold for jurisdictional discovery in this Circuit is low: a plaintiff needs only a good-faith belief that reasonable discovery could supplement its jurisdictional allegations. *Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023). The rule exists so that "the defendant [cannot] defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996).

Appellants identified specific, documented categories of District-directed conduct and named precisely what discovery would resolve: the location of American's compliance submissions, the scope of its D.C. office activities, Gulf Air's D.C. codeshare revenue, and the personnel handling the filings at issue. Those facts lay exclusively within Defendants' control. The District Court labeled that showing "speculation" (Order at 7) and dismissed without any discovery — the precise circularity *El-Fadl* condemned. Vacatur and remand for targeted jurisdictional discovery are warranted.

**3. The Order Resolved a Disputed Causation Fact at Rule 12(b)(6).**

This Court reviews Rule 12(b)(6) dismissals de novo, accepting well-pleaded allegations as true and granting the plaintiff the benefit of all reasonable inferences. *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Order declared it "impossible to see how" Defendants' regulatory failures could contribute to Captain Alhindi's incapacitation. Order at 7. That is a factual judgment against the non-moving party at the pleading stage, and Rule 12(b)(6) forbids it. Appellants plausibly alleged the causal chain with specificity. ICAO Annex 1 requires enhanced cardiovascular screening and medical-fitness certification for pilots over 60; Annexes 6 and 19 require a functioning Safety Management System (SMS) and Fatigue Risk Management System (FRMS) — binding conditions of Gulf Air's foreign air carrier permit. DOT Order 2023-4-16, App. Conds. (2), (4); Dkt. 2 ¶¶ 8, 26(A), 27, 48–49. The Captain was 63, hypertensive, and had suffered a prior on-duty incapacitation in 2004 — the high-risk profile these protocols exist to catch. Dkt. 2 ¶¶ 19(A), 24–26. Gulf Air performed none of the required screenings. Had it complied, the progressive 99% left coronary artery blockage — a condition that develops over years and that cardiovascular screening is designed to detect — would have been identified and the Captain grounded. Dkt. 2 ¶¶ 4, 24–26, 43–44, 429. That is the inference the Court was required to draw in Appellants' favor.

**A3. The "Caused the Death" Framing Leaves Eleven of Twelve Claims Unanalyzed.**

The Order characterizes the entire case as alleging that "negligence and safety violations . . . caused Captain Alhindi's death" (Order at 1), and that framing carries through every step of the Rule 8 analysis (Order at 7–8). The Amended Complaint

does not reduce to death causation. Of the twelve separately captioned causes of action, only Wrongful Death turns entirely on death causation. None of the remaining eleven turns on cardiac causation. The Order compresses the fifty-seven-page Complaint section in which these claims appear (Dkt. 2 at 28–84) into a single background sentence (Order at 2) that names no cause of action, and the Rule 8 analysis never returns to it. Dismissal of the unanalyzed claims is reversible error.

### B3. Each Claim Is Plausibly Pleaded.

The Amended Complaint pleads twelve separately captioned causes of action, each with its plaintiff(s), defendant, elements, damages, and record cite:

**Against Gulf Air:** Claim 1 — Wrongful Death (Samiha); Claim 2 — Negligence (Samiha, Feras); Claim 4 — Negligence Per Se (All); Claim 6 — Breach of Fiduciary Duty (Samiha, Feras); Claim 7 — Breach of Duty of Superior Knowledge (Samiha, Feras); Claim 8 — Fraudulent Concealment (All); Claim 9 — False Representation of Death Summary (All); Claim 11 — IIED (Samiha); Claim 12 — NIED (Feras). Dkt. 2 at 102–113. **Against American Airlines:** Claim 3 — Negligence (All); Claim 5 — Negligence Per Se (All); Claim 10 — Constructive Fraud (All). Dkt. 2 at 104–111.

Each claim pleads the elements of its cause of action with record support and survives Rule 12(b)(6). The claims turn on factual questions that Rule 12(b)(6) is not designed to resolve: whether Gulf Air conducted the required medical screenings and what those

screenings would have detected require discovery of records in Defendants' exclusive control; the causation chain between regulatory failures and the Captain's incapacitation requires expert medical and aviation-safety testimony; and the reasonableness of Defendants' conduct, the extreme-and-outrageous threshold for IIED, and the scienter element of the fraud claims are quintessentially jury questions. Dismissal on the pleadings short-circuited every one of those inquiries.

**4. RULE (8)**

**A4. The Rule 8 Dismissal Was an Abuse of Discretion.**

This Court reviews a Rule 8(a) dismissal for abuse of discretion. *Ciralsky v. CIA*, 355 F.3d 661, 668 (D.C. Cir. 2004). The Order's Rule 8 ground rests on a single characterization — that the complaints were "long, repetitive, disorganized, and difficult to follow" (Order at 2) — and the court dismissed without notice, without opportunity to cure, and without leave to amend.

"Rule 8 does not require a 'short and plain complaint,' but rather a 'short and plain statement of the claim.'" *Id.* at 669. Rule 8(d)(2)–(3) expressly permits multiple statements of a claim and as many separate claims as a party has. The Amended Complaint's twelve captioned claims in Attachment 4 (Dkt. 2 at 102–113) are exactly what the Rule permits. Gulf Air's motion lists every cause of action against it by name (Dkt. 43-1 at 1); American's motion separately analyzes each of its three claims with individual headings (Dkt. 42-1 at 5–7). A complaint whose substance two represented

Defendants could identify and brief is not one whose substance is "well disguised." *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995), cited with approval in *Ciralsky*, 355 F.3d at 669 n.9.

The Order labels its dismissal "without prejudice" (Dkt. 69 at 8), but that label does not match its effect. "[W]hen a suit is dismissed without prejudice, the statute of limitations is deemed unaffected by the filing of the suit, so that if the statute of limitations has run the dismissal is effectively with prejudice." *Ciralsky*, 355 F.3d at 672. The claims arise from events beginning December 14, 2022 and April 28, 2023. The two-year wrongful death limitations period has already run. The three-year limitations period governing Appellants' negligence, negligence per se, fraud, breach of fiduciary duty, breach of duty of superior knowledge, IIED, and NIED claims has run as to December 2022 conduct and will run as to the April 28, 2023 conduct imminently. The dismissal is therefore "effectively with prejudice." *Id.*

In that posture, the D.C. Circuit has been clear: "it will generally be an abuse of discretion to deny leave to amend when dismissing a nonfrivolous original complaint on the sole ground that it does not constitute the short and plain statement required by Rule 8." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988), quoted with approval in *Ciralsky*, 355 F.3d at 670. The District Court dismissed on that sole Rule 8 ground —

in direct conflict with *Ciralsky*'s governing rule. *Ciralsky* remanded in such circumstances. *Id.* at 674. This Court should do the same.

**B4. The Alternative Rule 8 Ruling Exceeded the District Court's Authority.**

A federal court without jurisdiction has no authority to rule on the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment — which comes to the same thing as an advisory opinion."). The Order framed its Rule 8 ruling as reaching pleading sufficiency "even assuming" the very jurisdiction it had just held lacking (Order at 7). That is the hypothetical judgment *Steel Co.* forbids. Even if this Court affirms the jurisdictional dismissal, the Rule 8 ruling must be vacated to prevent it from carrying preclusive effect against Appellants in any future forum

**5. The District Court Abused Its Discretion by Dismissing Without Notice or Opportunity to Amend.**

Rule 15(a)(2) requires courts to "freely give leave" to amend "when justice so requires." "Outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Absent undue delay, bad faith, prejudice, or futility, denial is abuse of discretion. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). The Order did not identify any specific pleading deficiency, gave no notice of what would cure the Rule 8 concern, and afforded no opportunity to amend before

dismissal. It does not mention Rule 15(a)(2) and finds no *Foman* factor. Appellants are pro se, and the Rule 8 concern — that the complaints were "long, repetitive, disorganized, and difficult to follow" (Order at 2) — was facially curable by reorganization, not new factual development. Dismissal without notice or opportunity to cure, in an effectively-with-prejudice posture, is the abuse of discretion *Foman* condemns. *Ciralsky v. CIA*, 355 F.3d 661, 670, 672 (D.C. Cir. 2004). This Court should vacate and remand with leave to amend.

**6. The Cumulative Procedural Unfairness Deprived Appellants of Due Process.**

Due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The record reflects unequal treatment that deprived Appellants of that opportunity. The district court stated on the record that deadline compliance was "a discretion of the judge" and that it did "not really care" if Defendants filed late (Tr. 8:16-21). Defendants' late filings were excused; Appellants' motions to strike those late filings were denied without reasoning (Dkts. 34, 35, 40, 41). The Order later denied six of Appellants' substantive motions — including motions raising factual disputes in Defendants' declarations and motions for jurisdictional discovery supported by documentary evidence — in a single omnibus paragraph without individualized analysis (Order at 8). And the Order granted "Defendants' Motions to Dismiss, Dkts. 7, 42, 43 (Order at

8), despite American's original motion (Dkt. 7) having been withdrawn at the March 28, 2025 pre-motion conference (Tr. 9:2-5). One side received discretion; the other received none. One side's papers were accepted late without consequence; the other side's papers were denied without analysis. One side's withdrawn motion was nonetheless granted; the other side's substantive motions were disposed of in a sentence. Cumulatively, these departures deprived Appellants of the meaningful opportunity to be heard that due process requires.

## CONCLUSION

For the reasons stated, Appellants respectfully request that this Court: **Reverse** the district court's dismissal for lack of personal jurisdiction and remand for further proceedings, including jurisdictional discovery; **Vacate** the district court's alternative rulings under Rule 8(a) and Rule 12(b)(6); In the alternative, if this Court concludes personal jurisdiction is lacking in the District of Columbia, **transfer** the case under 28 U.S.C. § 1631 to a district where it could have been brought, rather than affirm dismissal — given the "effectively with prejudice" consequence a dismissal would carry under the running statute of limitations. *Ciralsky v. CIA*, 355 F.3d 661, 672 (D.C. Cir. 2004); Grant Appellants leave to file a supplemental or amended brief in the event this Court identifies any deficiency in form or content, consistent with the liberal construction afforded pro se filings and the *Foman* standard of freely granting leave when justice so requires. *Foman v.*

Davis, 371 U.S. 178, 182 (1962); and On remand, direct that Appellants be permitted to amend the Complaint if needed to cure any pleading concern the district court may identify — relief the district court denied below without notice or articulated reason.

Respectfully submitted,

Dated: August 24, 2026

Tala Josephano, *Pro Se* Appellant

1876 PCH

Lomita, CA 90717

(347) 749-4980

Feras Hindi, *Pro Se* Appellant

7823 New London Drive

Springfield, VA 22153

(703) 980-6955

Samiha Ayyash, *Pro Se* Appellant

#6 Abu Nsair Karmeh Street

Jubaiha, Amman, Jordan 11937

(703) 623-3767

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Appellants hereby certify, on August 24 2026, that:

1. This document complies with the word limit because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9926 words.

2. This document complies with the typeface requirements because this document was prepared in a proportionally spaced typeface using Doc word in a 14-point Times New Roman font.

Respectfully submitted,

Dated: August 24, 2026

Tala Josephano, *Pro Se* Appellant

1876 PCH

Lomita, CA 90717

(347) 749-4980

F.H

Feras Hindi, *Pro Se* Appellant

7823 New London Drive

Springfield, VA 22153

(703) 980-6955

S.A

Samiha Ayyash, *Pro Se* Appellant

#6 Abu Nsair Karmeh Street

Jubaiha, Amman, Jordan 11937

(703) 623-3767

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system. A copy was also sent by email to:

1. Micah Ticatch, IslerDare PC, 1945 Old Gallows Road, Suite 650, Vienna, VA 22182. Email: Mticatch@islerdare.com
2. Mark A. Johnston, Eckert Seamans Cherin & Mellott, LLC, 1717 Pennsylvania Avenue, N.W., Suite 1200, Washington, DC 20006. Email: Mjohnston@eckertseamans.com
3. Darcy Osta, Eckert Seamans Cherin & Mellott, LLC, 1717 Pennsylvania Avenue, N.W., Suite 1200, Washington, DC 20006. Email: dosta@eckertseamans.com

Date : August 24 2026

Tala Josephano, Pro Se Appellant

1876 PCH

Lomita, CA 90717

Feras Hindi, Pro Se Appellant

7823 New London Drive

Springfield, VA 22153

Samiha Ayyash

#6 Abu Nsair Karmeh Street,

Jubaiha Amman Jordan 11937